UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
:
REPSOL, S.A.,                                            :
:
Plaintiff,               :
:          Case No:  1:12-cv-08799-TPG
:
v.                        :
:
:
CHEVRON CORP.,                                           :
:
Defendant.              :
:
:
---------------------------------------------------------x

**PLAINTIFF REPSOL, S.A.'S MEMORANDUM OF LAW
<u>IN OPPOSITION TO DEFENDANT CHEVRON CORP.'S MOTION TO DISMISS</u>**

QUINN EMANUEL URQUHART
 & SULLIVAN LLP

Richard I. Werder, Jr.
Sascha N. Rand
Stephen A. Broome
Jacob J. Waldman
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Tel: (212) 849-7000
Fax: (212) 849-7100

*Attorneys for Plaintiff Repsol, S.A.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ............................................................................................4

      A.     Argentina Privatizes YPF And Launches A U.S. IPO In Order To Raise
More Than A Billion Dollars From Private Investors, Including Repsol ...............4

      B.     Argentina Causes YPF To Adopt And Register Bylaws With The SEC To
Assure Investors That Argentina Could Not Seek To Take Control Of YPF
Without First Making A Tender Offer In Accordance With The
Company's Bylaws ..................................................................................5

      C.     In Reliance On The Bylaws, Repsol Acquires A Majority Interest In YPF
And Invests Billions Of Dollars To Develop The Energy Assets ..........................6

      D.     Argentina Seizes Control Of YPF In Violation Of The Company's Bylaws .........6

      E.     Chevron Seeks To Profit From Argentina's Improper Seizure Of Repsol's
Majority Interest In YPF ............................................................................7

ARGUMENT ............................................................................................................10

I.     CHEVRON'S ACT OF STATE DEFENSE CANNOT BE RESOLVED ON THE
PLEADINGS .....................................................................................................11

II.    THE COMPLAINT DOES NOT ASK THE COURT TO ADJUDICATE THE
VALIDITY OF THE EXPROPRIATION ACT OR OTHER PURPORTEDLY
"SOVEREIGN" ACTS .........................................................................................12

III.   THE ACT OF STATE DEFENSE IS INAPPLICABLE TO REPSOL'S CLAIMS
AGAINST CHEVRON..........................................................................................16

      A.     The Complaint Challenges Only Commercial Activity...........................................16

      B.     The Complaint Challenges Acts And Omissions That Occurred Beyond
Argentina's Borders .................................................................................20

CONCLUSION..........................................................................................................23

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adler v. Fed. Republic of Nigeria,*
   107 F.3d 720 (9th Cir. 1997) ...................................................................22

*Alfred Dunhill of London, Inc. v. Republic of Cuba,*
   425 U.S. 682 (1976) ...........................................................................19

*Allied Bank Int'l v. Banco Credito Agricola de Cartago,*
   757 F.2d 516 (2d Cir. 1985) ...................................................................21

*Ampac Grp. Inc. v. Republic of Honduras,*
   797 F. Supp. 973 (D. Fla. 1992) .............................................................17

*Arango v. Guzman Travel,*
   621 F.2d 1371 (5th Cir. 1980) .........................................................3, 14, 16

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...........................................................................10

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ...........................................................................10

*Boland v. Bank Sepah-Iran,*
   614 F. Supp. 1166 (S.D.N.Y. 1985) .....................................................3, 21, 24

*Braka v. Bancomer, S.N.C.,*
   762 F.2d 222 (2d Cir. 1985) ...................................................................16

*Commercial Bank of Kuwait v. Rafidain Bank,*
   15 F.3d 238 (2d Cir. 1994) ....................................................................22

*Daventree, Ltd. v. Republic of Azerbaijan,*
   349 F. Supp. 2d 736 (S.D.N.Y. 2004) ........................................................11

*DiRienzo v. Philip Servs. Corp.,*
   294 F.3d 21 (2d Cir. 2002) ....................................................................23

*Eckert Int'l, Inc. v. Gov't of the Sovereign Democratic Republic of Fiji,*
   834 F. Supp. 167 (E.D. Va. 1993) .........................................................14, 18

*EM Ltd. v. Republic of Argentina,*
   2009 WL 3149601, at *7 (S.D.N.Y. Sept. 30, 2009) .........................................21

*Ethiopian Spice Extraction Share Co. v. Kalamazoo Spice Extraction Co.,*
   543 F. Supp. 1224 (W.D. Mich. 1982) .....................................................23, 24

*Fir Tree Capital Opportunity Master Fund, LP v. Anglo Irish Bank Corp.,*
   2011 WL 6187077 (S.D.N.Y. Nov. 28, 2011) .................................................15

*First Nat'l Bank of Boston (Int'l) v. Banco Nacional de Cuba,*
   658 F.2d 895 (2d Cir. 1981) ..................................................................................16

*Glen v. Club Méditerranée,*
   450 F.3d 1251 (11th Cir. 2006) ..............................................................................16

*Hanil Bank v. P.T. Bank Negara Indonesia (Persero),*
   148 F.3d 127 (2d Cir. 1998) ...................................................................................22

*Hunt v. Mobil Oil Corp.,*
   550 F.2d 68 (2d Cir. 1977) .....................................................................................20

*Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia,*
   729 F.2d 422 (6th Cir. 1984) ..................................................................................24

*Keller v. Cent. Bank of Nigeria,*
   277 F.3d 811 (6th Cir. 2002) ..................................................................................22

*Kingdom 5-KR-41, Ltd. v. Star Cruises PLC,*
   2002 WL 432390 (S.D.N.Y. Mar. 20, 2002) ..........................................................23

*Konowaloff v. Metropolitan Museum of Art,*
   702 F.3d 140 (2d Cir. 2012) ...................................................................................12

*Lightwater Corp. v. Republic of Arg.,*
   2003 WL 1878420, at *5 (S.D.N.Y. Apr. 14, 2003).........................................21, 22

*Lyondell-Citgo Refining, LP v. Petroleos de Venezuela, S.A.,*
   2003 WL 21878798 (S.D.N.Y. Aug. 8, 2003) .........................................................11

*MOL, Inc. v. People's Republic of Bangladesh,*
   736 F.2d 1326 (9th Cir. 1984) ................................................................................16

*Newman & Schwartz v. Asplundh Tree Expert Co., Inc.,*
   102 F.3d 660 (2d Cir. 1996) ...................................................................................12

*NML Capital, Ltd. v. Republic of Argentina,*
   680 F.3d 254 (2d Cir. 2012) ...................................................................................21

*Outboard Marine Corp. v. Pezetel,*
   461 F. Supp. 384 (D. Del. 1978) .............................................................................18

*Republic of Argentina v. Weltover, Inc.,*
   504 U.S. 607 (1992) .....................................................................................19, 21, 22

*Saudi Arabia v. Nelson,*
   507 U.S. 349 (1993) ................................................................................................17

*Schmidt v. Polish People's Republic,*
   579 F. Supp. 23 (S.D.N.Y. 1984) ...........................................................................18

*Seybold v. Groenink,*
   2007 WL 737502 (S.D.N.Y. Mar. 12, 2007) ..........................................................22

iii

*Shapiro v. Republic of Bolivia,*
   930 F.2d 1013 (2d Cir. 1991) .......................................................................17

*United Bank Ltd. v. Cosmic Int'l, Inc.,*
   542 F.2d 868 (2d Cir. 1976) .........................................................................21

*United States v. Giffen,*
   326 F. Supp. 2d 497 (S.D.N.Y. 2004) ...........................................................20

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp. Int'l,*
   493 U.S. 400 (1990) .....................................................................................15

*Weltover, Inc. v. Republic of Argentina,*
   941 F.2d 145 (2d Cir. 1991) .........................................................................18

*WMW Mach., Inc. v. Werkzeugmaschinenhandel,*
   960 F. Supp. 734 (S.D.N.Y. 1997) ................................................................17

*World Wide Minerals, Ltd. v. Republic of Kazakhstan,*
   296 F.3d 1154 (D.C. Cir. 2002) ....................................................................16

## PRELIMINARY STATEMENT

On this motion, Chevron does not deny that the Complaint adequately alleges that Chevron both tortiously interfered with Repsol's contractual relationship with YPF, S.A. ("YPF," or the "Company") and aided and abetted breaches of fiduciary duty owed to Repsol by government-appointed managers of YPF following Argentina's expropriation of Repsol's majority stake in YPF.  Contrary to Chevron's assertion, the legislative act pursuant to which Argentina expropriated Repsol's majority stake in YPF (the "Expropriation Act") is not at issue in this action; rather, what is at issue is Chevron's conduct in interfering with Repsol's rights under YPF's bylaws registered with the U.S. Securities and Exchange Commission ("SEC"). Those bylaws constitute a commercial agreement expressly binding Argentina—before it took control of YPF—to first make a tender offer in New York City for the shares of YPF; that is, to comply with the commercial obligations that are a precondition to its expropriation of YPF. With Chevron's encouragement and inducement, Argentina breached its agreement to take the required commercial action in New York before expropriating YPF.  Accordingly, the Complaint challenges Chevron's actions taken with knowledge of Argentina's obligation (and failure) to take required commercial action in New York, and in no way requires this Court to determine the lawfulness of legislative or other purportedly "sovereign" actions taken by Argentina, much less action taken by Argentina solely within its own borders.

*Before* Argentina took control of Repsol's majority interest in YPF in violation of the bylaws, Chevron tortiously interfered with Repsol's contractual relationship with YPF by providing assurances that Chevron would overlook the bylaw violations and partner in Argentina's scheme to deprive Repsol of its rightful interest in substantial energy assets in Argentina (the "Energy Assets"), so long as Chevron received an interest in the Energy Assets for itself on favorable terms.  These pre-expropriation discussions between Chevron and Argentina were obviously commercial in nature.  *After* the expropriation, Chevron and YPF (now controlled by Argentina) entered into an *ultra vires* Memorandum of Understanding ("MOU") and other commercial agreements that constitute blatant violations of YPF's SEC-

1

registered bylaws.  Chevron did so knowing full well that its agreements with YPF were not approved by YPF's legitimate managers who had been properly appointed by Repsol, as majority shareholder, in accordance with the Company's bylaws.  Through these actions, and others detailed in the Complaint, Chevron has intentionally procured and facilitated breaches of contractual obligations owed to Repsol under the Company's bylaws, and knowingly and substantially assisted the government-appointed managers' breaches of fiduciary duties.

To prevent Chevron from taking advantage of its tortious actions and further harming Repsol's interests while Repsol and Argentina are embroiled in separate litigation in other proceedings over both the bylaw violations and the legality of the expropriation, Repsol here seeks declaratory and injunctive relief *against Chevron*.  The requested relief relates directly to *Chevron's* tortious acts and would restrain *Chevron* from taking action to develop the Energy Assets absent authority from YPF management appointed in accordance with the Company's bylaws.  Repsol also seeks damages from Chevron to compensate Repsol for the harm it has suffered as a result of Chevron's torts and to prevent Chevron from being unjustly enriched at Repsol's expense.

In its motion to dismiss, Chevron does not dispute that each of the claims asserted in the Complaint is adequately pled.  Nor does Chevron dispute that Argentina violated YPF's bylaws, which required Argentina, as a precondition to taking control of YPF, to first make a tender offer in New York City for outstanding shares.  Unable to challenge the sufficiency of Repsol's allegations, Chevron asserts only a *single* argument as to why the Complaint purportedly should be dismissed on the pleadings:  it contends that this Court may not adjudicate Chevron's alleged tortious acts because, in Chevron's erroneous view, resolution of Repsol's claims would require the Court to "impugn" the Expropriation Act, and therefore Chevron's conduct is somehow immune from liability under the so-called "act of state" defense.  Chevron is wrong and it cannot be allowed to hide its (or Argentina's) purely commercial actions under the label of sovereign authority.

*First*, as a threshold matter, the act of state defense is an affirmative defense that, absent exceptional circumstances not applicable here, is not a proper basis for dismissing Repsol's claims at the pleading stage.

*Second*, the Complaint does not assert claims against Argentina, or ask this Court to rule on the validity or propriety of the Expropriation Act—indeed, even assuming *arguendo* that the Expropriation Act is valid, Repsol should prevail on its claims in this action because the validity of the Act is irrelevant in this proceeding.  The Complaint asserts claims solely against Chevron for tortiously interfering with Repsol's rights under YPF's SEC-registered bylaws, and for aiding and abetting the government-appointed managers' breaches of their obligations to Repsol under those bylaws—breaches that resulted from commercial discussions between YPF and Chevron and that have resulted in commercial agreements between YPF and Chevron.  As set forth in other legal proceedings initiated by Repsol, Argentina's and Chevron's conduct also violates a variety of Repsol's rights under Argentine law, international and treaty law, and the laws of other foreign jurisdictions; but those other laws and claims are not at issue in this proceeding.  Rather, the rights and claims at issue here flow from Chevron's tortious interference with Argentina's binding commitment to Repsol and other YPF shareholders to take commercial action in New York, pursuant to YPF's SEC-registered bylaws, before seeking to take control of YPF by government fiat or otherwise.[1]  It is well established that "[t]he act of state doctrine . . . does not preclude judicial resolution of all commercial consequences stemming from the occurrence of . . . public acts."  *Arango v. Guzman Travel*, 621 F.2d 1371 (5th Cir. 1980).  Accordingly, the rights and claims asserted in the Complaint may properly be adjudicated by this Court.

*Third*, the act of state defense applies only to (1) "sovereign," as opposed to commercial, acts or omissions that (2) "come to *complete fruition* within a foreign state."  *Boland v. Bank Sepah-Iran*, 614 F. Supp. 1166, 1173 (S.D.N.Y. 1985) (emphasis added).  That is not the case here, where it is undisputed that Argentina, in its commercial capacity, entered U.S. markets in

---

[1]   Notably, the Expropriation Act upon which Chevron bases its act of state defense does not reference the bylaws and does not purport to amend or invalidate them.  (Margolis Decl. Exh. B.)

order to sell its shares in YPF to Repsol and other private investors in a U.S. IPO, registered the bylaws at issue in this action with the SEC, and, in order to assure investors that they would receive a properly compensated exit if Argentina ever sought to take control of YPF, included in the bylaws the specific provisions at issue here, that required Argentina to make a tender offer in New York City—a plainly non-sovereign commercial act engaged in by individuals, corporations, and investment funds every day—for outstanding shares of YPF before seeking to take control of YPF. The case law is clear that Argentina cannot enter the markets as a commercial actor, make commercial commitments in its capacity as a commercial actor, and then later seek to exit the markets by claiming to be a *sovereign* actor that can disregard its prior commercial commitments in order to reap a multi-billion dollar windfall at the expense of investors in New York and abroad that relied on those commercial commitments. And, of course, if the act of state defense cannot bar YPF-related claims asserted by Repsol against Argentina, it certainly is no defense to Repsol's claims in this action asserted solely against Chevron: indeed, even if *Argentina* could somehow avoid liability for breaching the bylaws by invoking certain defenses applicable to sovereign states (it cannot, as Repsol will demonstrate in a separate lawsuit against Argentina),[2] Repsol's claim that *Chevron* induced that breach stands independently of its claim against Argentina based on the breach itself.

The motion to dismiss should be denied.

## STATEMENT OF FACTS

### A. Argentina Privatizes YPF And Launches A U.S. IPO In Order To Raise More Than A Billion Dollars From Private Investors, Including Repsol

YPF was formerly Argentina's state-owned oil company. (Compl. ¶ 22.) In 1992, Argentina privatized YPF and became the Company's sole shareholder. (*Id.*) In 1993, Argentina caused the Company to engage in an SEC-registered IPO (the "U.S. IPO") that generated more than a billion dollars in capital for Argentina. (*Id.*)

In order for Argentina to list YPF's shares on the New York Stock Exchange ("NYSE"), it was required to create American Depository Shares ("ADS")—which correspond to Class D

---

[2] *See Repsol YPF, S.A. v. Republic of Argentina*, Case No. 12-CV-3877 (2012) (TPG).

shares of YPF stock—through a Deposit Agreement with a New York financial institution, the Bank of New York Mellon. (*Id.* ¶¶ 18, 23.) Section 7.06 of the Deposit Agreement provides: "This Deposit Agreement and the [ADS] shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York." (Broome Decl. Exh. A.)

### B. Argentina Causes YPF To Adopt And Register Bylaws With The SEC To Assure Investors That Argentina Could Not Seek To Take Control Of YPF Without First Making A Tender Offer In Accordance With The Company's Bylaws

Before the U.S. IPO, Argentina, acting in its commercial capacity as YPF's then-sole shareholder, caused YPF to adopt bylaws that were filed with the SEC. (Compl. ¶ 24.) The bylaws expressly require, among other things, that before Argentina can take a controlling interest in YPF (whether by expropriation or otherwise), it must make a public tender offer for YPF's shares in New York City, and publish notice of its tender offer at least once a week for the duration of the offer in the business section of the major New York newspapers. (*Id.* ¶¶ 24, 45-46.) The bylaws also set forth specific procedures for determining the price at which Argentina's tender offer must be made, and impose a ban on the voting by Argentina of any expropriated shares if it fails to make the tender offer in accordance with the bylaws. (*Id.* ¶ 25.) Section 28 of the bylaws specifically prohibits Argentina from exercising control over the Company unless and until it makes a tender offer for all outstanding shares under Section 7 of the bylaws. (*Id.* ¶ 46.) In effect, the bylaws do not preclude expropriation but instead presume it could occur—and accordingly, provide a purely commercial exit mechanism (a tender offer) to protect shareholders who invested capital in Argentina's purely commercial venture (the public issuance of shares) in a purely commercial entity (YPF, a publicly traded company).

These bylaws constitute a commercial agreement of which the shareholders are the contractual beneficiaries. The bylaws were specifically designed to—and did—induce investors such as Repsol to purchase the Company's shares, both in the original IPO and thereafter on the NYSE and other stock exchanges, by ensuring that the investors would be provided a properly compensated exit in the event Argentina were to seek to take control of YPF. (*Id.* ¶ 44.)

### C.   In Reliance On The Bylaws, Repsol Acquires A Majority Interest In YPF And Invests Billions Of Dollars To Develop The Energy Assets

In 1999, Repsol acquired control of YPF through a purchase of Argentina's remaining stake in the Company and, pursuant to section 7 of the bylaws, by making a tender offer to purchase most of the shares and ADS corresponding to the shares then being held by other private investors (ironically, thereby demonstrating the commercial and non-sovereign nature of the tender offer process contemplated by YPF's bylaws).[3]  (*Id.* ¶ 27.)  Repsol ultimately purchased over 99% of YPF's capital stock.  (*Id.*)  In acquiring shares of YPF, Repsol relied on the bylaws, which expressly provide that Argentina shall make its own tender offer in New York for outstanding shares before seeking to take control of the Company, thereby ensuring Repsol a properly compensated exit.  (*Id.* ¶¶ 27, 44-46.)  As majority shareholder, Repsol controlled YPF for well over a decade, until April 2012, and, in accordance with the Company's bylaws, appointed the majority of the Company's officers and directors.  (*Id.* ¶ 29.)

After acquiring a majority interest in YPF, Repsol invested billions of dollars in YPF to develop the Company's assets, including the Energy Assets.  (*Id.* ¶¶ 33-34.)  Repsol's investment should have paid off—on February 8, 2012, YPF announced that it had discovered an estimated 23 billion barrels of oil equivalent in the form of shale oil and gas located in the *Vaca Muerta* formation.  (*Id.* ¶ 38.)  Thus, under Repsol's majority ownership and control, YPF increased the value of its rights to develop oil and gas resources in Argentina by billions of dollars.  (*Id.* ¶ 40.)

### D.   Argentina Seizes Control Of YPF In Violation Of The Company's Bylaws

Repsol would not see its investment in YPF pay off, however, because on April 16, 2012, two months after Repsol's February 8, 2012 announcement, Argentina announced that it intended to seize control of YPF from Repsol and replace YPF's management with government "Intervenors."  (*Id.* ¶ 42.)  That same day, Argentina forcibly removed Repsol-appointed management from YPF's premises and suspended the authority of YPF's board of directors.

---

[3]   In 2008, Petersen Energía Inversora, S.A. also made a tender offer for YPF shares pursuant to section 7 of the Company's bylaws, further demonstrating that the tender offer requirement that Argentina, as a YPF shareholder, caused the Company to adopt and to which it agreed to be bound, is purely commercial in nature and binding on *all* of YPF's current and potential shareholders, including Argentina.  (Broome Decl. Exh. B.)

(*Id.*)  On May 7, 2012, Argentina seized a controlling stake in YPF by expropriating 51 percent of the Company's shares solely from Repsol.  (*Id.*)  Argentina, however, did not first make a tender offer for YPF's shares, and its seizure of Repsol's majority stake in the Company therefore breached the bylaws.  (*Id.* ¶¶ 42, 44.)[4]

Chevron does not and could not dispute that the manner in which Argentina seized control of the Company from Repsol, and the subsequent exercise of control over the Company by the government-appointed managers, constitute direct violations of provisions of the Company's bylaws that expressly require Argentina, before taking a controlling interest in YPF, to issue a public tender offer in New York for the Company's shares at a price determined by a set formula.  (*Id.* ¶ 7.)  The Expropriation Act does not mention this bylaw provision, and does not purport to invalidate or amend it.  (Margolis Decl. Exh. B.)

E.     **Chevron Seeks To Profit From Argentina's Improper Seizure Of Repsol's Majority Interest In YPF**

Before the expropriation, Repsol had initiated, through YPF, negotiations for developing the Energy Assets with several potential partners, including Chevron.  (Compl. ¶¶ 4, 36.)  As a result of its negotiations with Repsol, Chevron understood the enormous value of such assets and proposed specific terms for a partnership to develop the Energy Assets.  (*Id.*)  Unbeknownst to Repsol, however, Chevron met with Argentine officials before the expropriation and, notwithstanding Chevron's knowledge that absent a tender offer by Argentina, its exercise of control over the Company would violate, among other things, YPF's bylaws, and that any agreements with YPF's government-appointed managers would be *ultra vires*, Chevron gave its assurance that it was willing to do business with YPF following the expropriation so long as

---

[4]     This action, which is brought solely against Chevron and with respect to its conduct alone, is pursued without prejudice to Repsol's rights and claims against Argentina in other proceedings.  In addition to breaching YPF's bylaws, Argentina's misconduct also violated numerous provisions of, *inter alia*, Argentine, treaty and international law.  (*Id.* ¶¶ 42, 44.) Repsol is currently pursuing claims against Argentina for such misconduct in separate proceedings, including in this Court and the International Centre for the Settlement of Investment Disputes ("ICSID"), and seeks, *inter alia*, restitution of its interest in the Company and the attendant rights in the Energy Assets.  (*Id.* ¶ 5.)

Chevron would receive, in exchange, an interest in the Energy Assets on favorable terms.  (*Id.* ¶¶ 1, 50-54.)

Chevron also does not dispute that it was aware that Argentina's subsequent seizure of control of YPF without making a tender offer breached the Company's bylaws.  (*Id.* ¶ 8.)  It could not.  The bylaw violations have been the subject of public debate and criticism, and Argentina repeatedly and publicly has declared that it will not honor its obligation under the bylaws to compensate Repsol for the expropriation of its majority interest in YPF.  (*Id.*)  Indeed, in a hearing before the Argentine Senate, Argentina's Vice-Minister of the Economy, Axel Kicillof, mocked the notion that Argentina should be required to comply with YPF's bylaws or other legal obligations to Repsol, stating that only "fools" would expect Argentina to comply with YPF's bylaws, and declaring that "'[l]egal certainty' and 'investment climate' are two horrible words."  (*Id.*)

Nor does Chevron dispute that it was aware that, because the government-appointed managers were appointed in violation of the Company's bylaws, they lacked authority to enter the Memorandum of Understanding ("MOU") and other agreements with Chevron.  (*Id.* ¶ 9.) Chevron, however, was determined to secure an interest for itself in the Energy Assets, and gave assurances to Argentina that it would disregard the bylaw breaches and the government-appointed managers' breaches of their fiduciary duties to Repsol.  (*Id.* ¶ 10.)  With full knowledge of the bylaw violations and breaches of fiduciary duties, Chevron successfully sought to secure and then memorialized an agreement for the development of the Energy Assets with YPF's new government-appointed managers.  (*Id.*)

Chevron's willingness to encourage Argentina, and to give assurances that it would stand by Argentina and thereby capitalize on Argentina's seizure of Repsol's majority interest in YPF in violation of the Company's bylaws, is in stark contrast with that of other major players in the industry.  (*Id.*)  Christophe de Margerie, Chairman and CEO of Total, stated that, unlike Chevron, Total is "not going to take advantage of Repsol and leap at assets that may well be cheaper given the situation . . . that's not our style."  (*Id.*)  Indeed, Chevron's own CFO, Patricia

Yarrington, purported to voice her criticism of Argentina's seizure of Repsol's majority stake in YPF, noting that "[w]hen you see that happen . . . it does give you pause.  It makes you sit up and take notice."  (*Id.* ¶ 48.)

Nevertheless, Chevron's decision-makers did not "pause" for long:  having "notice[d]" and been motivated by the opportunity to obtain an interest in the Energy Assets at a discount, Chevron was willing to overlook the bylaw and fiduciary duty violations; and, in September 2012, YPF and Chevron entered into a MOU regarding the development of the Energy Assets.  (*Id.* ¶¶ 15, 55.)  YPF acknowledged in a press release issued at the direction of its government-appointed managers that, in Repsol's absence, the MOU with Chevron is "one of the cornerstones" of Argentina's plan to develop the Energy Assets.  (*Id.* ¶ 51.)

Recent news reports indicate that YPF and Chevron have continued to negotiate additional agreements relating to the Energy Assets and to consider agreements to bring in additional investors and partners.  (*Id.* ¶ 14.)  On or around August 30, 2012, for example, YPF's government-appointed CEO, Miguel Galuccio, unveiled a $37.2 billion five-year investment plan to develop YPF's assets, including the Energy Assets.  (*Id.*)  Mr. Galuccio acknowledged that the plan depends significantly on investment from, and joint-ventures and partnerships with, major oil companies like Chevron.  (*Id.*)  Indeed, he noted the importance of Chevron's supposedly "unique expertise" in shale oil exploration—expertise that YPF possessed under Repsol's management, but which YPF lacks now that Argentina has replaced all Repsol-appointed managers with the government-appointed managers.  (*Id.* ¶ 50.)  For this reason, it is not surprising that Mr. Galuccio has referred to YPF's agreements with major oil companies—such as the MOU with Chevron—as "one of the cornerstones" of his plan.  (*Id.* ¶ 14.)

In September 2012, notwithstanding Argentina's blatant violations of the Company's bylaws and the fact that YPF's current managers lack authority, Ali Moshiri, a Chevron executive, stated that Chevron is "pleased to accompany [YPF in] this new process," and is "looking forward to working with the [Argentine] government" to develop the Energy Assets and "strategically partnering with YPF."  (*Id.* ¶ 15.)  More recently, on November 19, 2012,

Chevron publicly declared that "Chevron stands by the legitimacy of its memorandum of understanding with YPF." (*Id.*)[5]

Repsol filed this action to restrain Chevron from causing further irreparable harm to Repsol by proceeding with the *ultra vires* MOU and any other agreements relating to the Energy Assets, and to recover damages caused by Chevron's tortious acts.

## ARGUMENT

To prevail on its motion to dismiss, Chevron must demonstrate that the Complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Chevron's motion concedes, by its deafening silence, that the Complaint adequately pleads the elements of each of the claims asserted therein. Rather than challenging the sufficiency of the pleadings, Chevron instead invokes the act of state defense and erroneously contends that Repsol's claims against it are "non-justiciable." (Br. at 6.)

As an initial matter, it would be premature to dismiss the Complaint at the pleading stage based on an inherently fact-dependent affirmative defense, such as the act of state defense. Moreover, even if it were appropriate to consider the act of state defense at this stage—and the case law makes clear that, under the circumstances at issue in this action, it clearly is not—the defense is not applicable here because the Complaint does not ask the Court to adjudicate the Expropriation Act or any other purportedly "sovereign" act by Argentina taken within the territory of Argentina. Rather, the Complaint asserts claims solely against Chevron for tortiously interfering with Repsol's commercial rights as a shareholder under YPF's SEC-registered bylaws and for aiding and abetting the government-appointed managers' breaches of their fiduciary duties to Repsol under those bylaws. The bylaws—which are the result and embodiment of

---

[5] Chevron has executed further commercial agreements with YPF since Repsol filed its Complaint in this action. (*See* Broome Decl. Exh. C (Form 6-K) (disclosing December 19, 2012 "exclusivity agreement").)

commercial action by Argentina—indisputably required Argentina to engage in further commercial action (to make a tender offer) in New York as a precondition to taking control of YPF, whether by legislative or other purportedly "sovereign" action by Argentina. Repsol's Complaint is thus predicated upon Argentina's breach of its commercial obligation (to make a tender offer), as set forth in a commercial agreement (the YPF bylaws) and in particular, Argentina's failure to take that commercial action in New York, as also required by the bylaws, as well as on commercial discussions and commercial agreements between Chevron and YPF negotiated and carried out in derogation of the bylaws. Because the only conduct by Argentina that is relevant in this proceeding is its conduct as a commercial actor pursuant to a commercial agreement, including commercial conduct required to be effected beyond its borders, the case law is clear that neither Argentina nor its new business partner Chevron can establish an act of state defense.

Accordingly, the motion to dismiss should be denied.

## I.   CHEVRON'S ACT OF STATE DEFENSE CANNOT BE RESOLVED ON THE PLEADINGS

As a threshold matter, it is premature to consider Chevron's act of state defense on a motion to dismiss because it is a fact-dependent, affirmative defense as to which the "party asserting the defense"—here, Chevron—bears the "burden of establishing that the conduct of a foreign government amounts to an Act of State." *Daventree, Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 754-55 (S.D.N.Y. 2004) ("As a substantive rather than a jurisdictional defense, the Act of State doctrine is [not] appropriately raised in a . . . motion to dismiss."); *Lyondell-Citgo Refining, LP v. Petroleos de Venezuela, S.A.*, 2003 WL 21878798, at *9 (S.D.N.Y. Aug. 8, 2003) (rejecting defendants' attempt "to use the act of state doctrine as a shield at" the motion to dismiss stage).

Chevron acknowledges (Br. at 6 n.5) that "the act of state doctrine is properly raised as an affirmative defense," but erroneously contends that this Court may nevertheless dismiss the Complaint "on the basis of the act of state doctrine." The sole case upon which Chevron relies, however, confirms that the act of state doctrine is "an affirmative defense as to which the

[defendant] ha[s] the burden" of proof, and that the defense is *not* an appropriate basis for a motion to dismiss except in the rare circumstance "when its applicability is shown on the face of the complaint."  *See Konowaloff v. Metropolitan Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012).  That is not the case here.[6]  Even assuming *arguendo* that some circumstances might exist such that the act of state defense could be applied to bar Repsol's claims against Chevron, including for Chevron's pre-expropriation conduct—and it could not, for the reasons explained below—the applicability of the defense would depend on numerous factual issues that cannot be decided on the pleadings alone.[7]

Accordingly, Chevron's act of state defense is premature and its motion to dismiss must be denied.

## II.   THE COMPLAINT DOES NOT ASK THE COURT TO ADJUDICATE THE VALIDITY OF THE EXPROPRIATION ACT OR OTHER PURPORTEDLY "SOVEREIGN" ACTS

Contrary to Chevron's argument (Br. at 12-14), Repsol's Complaint does not ask the Court to opine on the validity of the Expropriation Act or any other "official" or "sovereign" act by Argentina; nor must the Court "impugn the expropriation act if it is to rule in Repsol's favor" (Br. at 14).  Rather, Repsol's claims are based on improper commercial activities *by Chevron*—

---

[6]   In *Konowaloff*, the plaintiffs filed suit in New York challenging simply the Soviet government's seizure of property from a Russian national, in Russia—*i.e.*, "precisely what the act of state doctrine bars the United States courts from determining," *id.* at 147, rather than separate commercial obligations and conduct that were triggered by an expropriation decision, as here.  The Complaint in this action, by contrast, relates—first and foremost—to acts *by Chevron*, including conduct that pre-dated the expropriation.  The Complaint also relates, of course, both to Argentina's failure to take non-sovereign commercial action that was required to be taken in New York under YPF's SEC-registered bylaws and to purely commercial acts and omissions by YPF's government-appointed managers that violated those bylaws and necessarily resulted in effects outside Argentina's borders.  Those acts and omissions have nothing in common with the facts of *Konowaloff*.

[7]   Chevron devotes several pages to describing:  (1) Chevron's views on the purported history, purpose, and effect of the Expropriation Act; and (2) Chevron's speculation as to the nature of the claims that Repsol is asserting against Argentina in ICSID.  (Br. at 4-5, 8, 12-13.)  Chevron's self-serving ruminations are not based on any allegations in the Complaint; instead, Chevron improperly refers to purported "public reports" and attaches to its motion to dismiss a news article in order to bolster its assumptions.  (*See, e.g.*, Br. at 12 & Margolis Decl. Exh. C.)  Chevron's need to refer to speculative, extrinsic evidence outside the Complaint's four corners only confirms that its act of state defense is premature at this early stage in the proceedings.  *See Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir.1996) (district court "improperly relied upon extra-complaint information in granting the motion to dismiss").

including commercial activities that pre-dated the expropriation—that have interfered with Repsol's rights under YPF's bylaws and that threaten to unjustly enrich Chevron at Repsol's expense.

As alleged in the Complaint, Chevron induced a breach of YPF's bylaws by providing pre-breach assurances to Argentina that Chevron would enter into commercial transactions with YPF following a breach.  After the breach, Chevron compounded the harm by actually entering into such transactions with YPF—transactions that, as alleged in the Complaint, will unjustly enrich Chevron at Repsol's expense.  This Court can evaluate Chevron's alleged misconduct without adjudicating the propriety of any "official" or "sovereign" act by Argentina.

To the extent that Repsol's claims require the Court to evaluate any acts or omissions of Argentina or YPF's government-appointed managers, the claims are not based on the illegality of the Expropriation Act.  Rather, they are—as Chevron acknowledges—"premised on the allegation that YPF's government-appointed managers 'were appointed in contravention *of the Company's bylaws* and [thus] lack actual or apparent authority to take actions on the Company's behalf . . . .'" (Br. at 12 (quoting Compl. ¶¶ 65-66).)  Thus, in order for the Court to find that the government-appointed managers lacked actual or apparent authority to enter into the MOU and other agreements with Chevron, and that Chevron is liable for tortious interference with contract and aiding and abetting breaches of fiduciary duty, the Court need look only to Argentina's admitted violations of the purely commercial tender offer requirements of the bylaws that *Argentina*—in its commercial capacity—is bound by (and indeed, agreed to and registered with the SEC upon launching a U.S. IPO for YPF's shares in 1993).

Chevron's argument (Br. at 15-17) that Repsol is simply "re-casting" its claims as contract-based (*i.e.*, based on the bylaws) in order to avoid making a direct challenge to the Expropriation Act and evade an act of state defense is baseless.[8]  Argentina drafted, executed, and registered the bylaws with the SEC for the very purpose of assuring investors that Argentina

---

[8]   Chevron asserts (Br. at 15-16) that the Expropriation Act does not require Argentina make a tender offer for the shares of YPF.  This may be true, but it misses the point of Repsol's claim, which is that *the bylaws* do impose such a requirement (and the Expropriation Act does not purport to amend or invalidate that requirement).

would not later invoke its status as a sovereign nation to seize control of the Company without first providing investors fair compensation in accordance with the bylaws' purely commercial precondition to taking control (*i.e.*, the making of a tender offer). *See Eckert Int'l, Inc. v. Gov't of the Sovereign Democratic Republic of Fiji*, 834 F. Supp. 167, 171 (E.D. Va. 1993) ("[W]here, as here, a foreign state has entered into an essentially commercial contract for the performance of consulting services, it may not claim sovereign immunity" to avoid liability for a subsequent breach of that contract). Repsol's claims based both on the interference with, and commercial conduct in violation of, the bylaws thus may properly be adjudicated by this Court, and without any need—in this action—for the Court to opine on the validity of the Expropriation Act.[9]

Indeed, courts specifically have held that the act of state defense does not bar claims challenging the commercial consequences of state action as opposed to truly "sovereign" or "official" acts. In *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371 (5th Cir. 1980), for example, the Dominican Republic turned away U.S. tourists, including the plaintiffs, and forcibly re-routed them to Puerto Rico. *Id.* at 1379. The plaintiffs sued "Dominicana," an arm of the Dominican Republic that had contracted to provide "air transportation and 'tourist cards'" to the plaintiffs. *Id.* at 1374. In rejecting Dominicana's act of state defense, the Fifth Circuit held that "[t]he act of state doctrine . . . does not preclude judicial resolution of all commercial consequences stemming from the occurrence of . . . public acts. The [plaintiffs'] contract and negligence claims require only a determination of the respective rights and duties of the parties in the wake of the sovereign acts of the Dominican immigration authorities. . . . They do not necessitate a consideration or evaluation of the legitimacy of those 'acts of state' themselves.'"

*Id.* at 1380-81; *see also W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp. Int'l*, 493 U.S. 400, 406

---

[9]   Chevron is incorrect in contending (Br. at 17) that Repsol "cannot consistently assert that Argentina's acts are a mere breach of bylaws or anything other than" the act of a sovereign because Repsol "appears to be asserting just the opposite in order to state a claim before ICSID." Repsol does not allege that Argentina's acts are limited to a "mere breach of bylaws"; as Chevron is aware, Repsol is challenging the propriety of Argentina's and the government-appointed managers' acts under Argentine, Spanish, and international law, in various other tribunals, as it is within Repsol's rights to do. Repsol's claims in other actions do not give rise to an act of state defense for Chevron in this action, however, where the Court need not evaluate the validity of the Expropriation Act in order to adjudicate Repsol's claims against Chevron, but instead need only examine whether SEC-registered bylaws were breached.

(1990) ("Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign.  When that question is not in the case, neither is the act of state doctrine."); *Fir Tree Capital Opportunity Master Fund, LP v. Anglo Irish Bank Corp.*, No. 11-cv-0955 (PGG), 2011 WL 6187077, at *14 (S.D.N.Y. Nov. 28, 2011) ("Assuming *arguendo* that the Bank acted under compulsion from the Irish government, it does not follow that the Bank engaged in sovereign rather than commercial activity.  Indeed, because a foreign instrumentality such as a nationalized or central bank presumably always acts at the volition of a foreign government, were this Court to accept the Bank's argument, the commercial activity exception would be rendered nugatory.").

Here, the Complaint alleges—and Chevron does not dispute on this motion—that Chevron encouraged and facilitated Argentina's plan to breach the SEC-registered bylaws by failing to make a tender offer in New York and that the government-appointed managers lacked actual and apparent authority under those bylaws to enter the MOU.[10]  The bylaws indisputably required Argentina, before seeking to take control of YPF, to make a tender offer for all outstanding shares in New York.  Argentina failed to do so.  As a commercial consequence of Argentina's failure to make a tender offer, it breached the bylaws.  As a further commercial consequence of the bylaw breach, the YPF managers appointed by Argentina with whom Chevron has dealt lack authority to act on behalf of the Company.  In this respect, this case is on all fours with *Arango*.  Contrary to Chevron's argument, the Court can determine that Argentina breached the bylaws without opining on the validity of the Expropriation Act or any other purportedly "official" or "sovereign" act by Argentina.[11]

---

[10]   Section 7(h) of YPF's bylaws provides that any shares acquired by Argentina without first making a tender offer "shall not grant any right to vote . . . nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings."  (Broome Decl. Exh. D.)  Accordingly, Argentina had neither the right to remove the Repsol-appointed managers nor the right to appoint the government managers.

[11]   Chevron cites several, inapposite decisions in which the act of state defense was upheld under the particular facts of those cases.  But in each case the plaintiff was challenging the act of expropriation itself (or some other purely sovereign act) as opposed to the type of consequential commercial activity at issue here.  *See, e.g., MOL, Inc. v. Peoples Republic of Bangladesh*, 736 F.2d 1326, 1328 (9th Cir. 1984) (rejecting challenge to Bangladesh's termination of agreement to permit the export of monkeys because Bangladesh was "terminating

## III.   THE ACT OF STATE DEFENSE IS INAPPLICABLE TO REPSOL'S CLAIMS AGAINST CHEVRON

Even if Chevron were correct in contending (Br. at 14) that this Court must "impugn the expropriation act if it is to rule in Repsol's favor" (and as shown above, Chevron is incorrect), the act of state defense is inapplicable to Repsol's claims against Chevron because the claims are predicated on purely commercial acts and omissions that occurred, at least in part, outside of Argentina.

### A.   The Complaint Challenges Only Commercial Activity

Chevron does not—because it cannot—dispute that Argentina engaged in purely commercial activity when, in 1993, as the sole shareholder of YPF, it launched an IPO for YPF's shares; sold those shares on the NYSE and other exchanges to private investors such as Repsol for more than $1 billion; and in connection therewith, caused the adoption of, and registered with the SEC, the Company's bylaws, including provisions by which Argentina itself agreed that it would be bound to commence a tender offer (the quintessential commercial act of private citizens and corporations) in the event it sought to re-take control of YPF.  Any argument that such activity was "sovereign" in nature would be unavailing, for it is well established that a government's sale to private investors of equity in a formerly state-owned enterprise is a purely commercial act.  *See, e.g.*, *Ampac Grp. Inc. v. Republic of Honduras*, 797 F. Supp. 973, 976 (D. Fla. 1992) ("The sale of a company [by government] owners to the highest bidder *is a routine commercial transaction*.") (emphasis added); *WMW Mach., Inc. v. Werkzeugmaschinenhandel*, 960 F. Supp. 734, 740 (S.D.N.Y. 1997) (rejecting act of state defense and finding that the entity

---

an agreement that only a sovereign could have made" in the first place); *First Nat'l Bank of Boston (Int'l) v. Banco Nacional de Cuba*, 658 F.2d 895 (2d Cir. 1981) (rejecting plaintiff's challenge to Cuba's expropriation of certain banks and the property held therein); *Glen v. Club Méditerranée*, 450 F.3d 1251 (11th Cir. 2006) (rejecting plaintiffs' challenge to Cuba's expropriation of land); *Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985) (rejecting plaintiff's challenge to Mexico's enactment of currency controls to "sav[e] its national economy from the brink of monetary disaster").  Chevron's reliance on *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002), is particularly misguided.  In *World Wide Minerals*, the court held that implementation of import and export controls and the decision to grant or deny licenses were uniquely sovereign functions that barred the plaintiffs' claims against Kazakhstan; significantly, the court allowed the plaintiffs' tortious interference and other claims against a corporate defendant in this action to proceed.  *Id.* at 1165, 1168.

used to privatize industry took actions "reflect[ing] an exercise of 'powers that can also be exercised by private citizens,' and are akin to those that a controlling stockholder of a corporation might take as a 'player in the private market'") (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993)); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1018 (2d Cir. 1991) ("It is self-evident that issuing public debt is a commercial activity . . . ."); *Schmidt v. Polish People's Republic*, 579 F. Supp. 23, 26 (S.D.N.Y. 1984) ("issuing bonds to raise [] necessary capital" is commercial activity even when performed by a sovereign state); *Outboard Marine Corp. v. Pezetel*, 461 F. Supp. 384, 398 (D. Del. 1978) ("there can be no genuine insult to sovereignty when a foreign enterprise undertaking to do business in a given market place is subject to the nondiscriminatory laws of that market place").

It is equally well established that when a foreign nation enters the markets (and especially the U.S. securities markets for registered public companies) to raise capital from private investors—as Argentina did when it sold more than a billion dollars in YPF shares in an IPO on the NYSE and exchanges around the world—it does so subject to the same rules and regulations as every other market participant.  As the court explained in *Eckert*:

> Foreign states entering into [private] contracts cannot be permitted to claim immunity from suit on such contracts merely by arguing that the contract had some governmental purpose.  Were this Court to hold otherwise, foreign states would be free to enter into essentially commercial contracts with domestic entities and then, relying on sovereign immunity, abandon their obligation whenever it suited them to do so.

834 F. Supp. at 171; *see also Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 151 (2d Cir. 1991) ("Because the issuance of the debt was a commercial activity, the subsequent breach of contract cannot be cloaked in immunity.  Once a sovereign enters the marketplace as a commercial actor, it should be subject to all the rules of the marketplace.") (citation omitted).

Characterizing Argentina's violation of YPF's bylaws—that Argentina, *qua* shareholder, caused to be adopted and by which it agreed to be bound—as a sovereign, as opposed to a commercial, act would be particularly inappropriate here.  Had investors such as Repsol known that, if and when YPF were to become profitable (*e.g.*, upon discovering massive oil and gas

17

resources as a result of Repsol's and other shareholders' investment of expertise, time, and billions of dollars in capital), Argentina—with the assistance of opportunistic third parties such as Chevron—would simply take the Company back and ignore the bylaws, investors would never have purchased YPF shares from Argentina in the first place.

As the Court is well aware, this is not the first time that Argentina has sought to profit from private investors by first entering U.S. markets as a commercial actor, but then later attempting to exit the markets with a windfall by purporting to invoke its status as a sovereign nation. In *Republic of Argentina v. Weltover, Inc.*, for example, Argentina issued billions of dollars of bonds to private investors in order to raise capital to fund purportedly public projects. 504 U.S. 607, 610 (1992). But when Argentina subsequently determined that making payments pursuant to the bond indenture should take a backseat to other items on the government's agenda, Argentina decided unilaterally to extend the maturity date of the bonds. *Id.* at 610. The bondholders filed suit against Argentina in the United States, and, predictably, Argentina asserted it was immune from suit because it purportedly acted in its capacity as a sovereign nation. *Id.* The Supreme Court rejected Argentina's act of state defense because Argentina plainly had entered the bond market as a commercial, as opposed to a sovereign, actor: "when a foreign government acts, *not as a regulator of the market, but in the manner of a private player within it*, the foreign sovereign's actions are 'commercial,'" and the act of state defense is unavailable. *Id.* at 614.

Similarly, in *Alfred Dunhill of London, Inc. v. Republic of Cuba*, the Supreme Court held that "interventors" installed by the Cuban government to run its recently-nationalized cigar businesses were not permitted to repudiate those businesses' debts incurred to U.S. cigar importers before nationalization simply because the interventors were acting pursuant to legislation passed by the Cuban government. 425 U.S. 682, 692 (1976). Notwithstanding the directives of the Cuban government, the interventors lacked "the power selectively to refuse payment of legitimate debts arising from the operation of those commercial enterprises." *Id.* at 693. The Court further explained that "the concept of an act of state should not be extended to

18

include the repudiation *of a purely commercial obligation owed by a foreign sovereign* or by one of its commercial instrumentalities" because a foreign nation cannot not cloak its commercial acts in sovereign immunity simply by labeling them acts of state. *Id.* at 695, 705; *see also Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 79 (2d Cir. 1977) (acknowledging commercial exception to the act of state defense articulated in *Dunhill*); *United States v. Giffen*, 326 F. Supp. 2d 497, 503 (S.D.N.Y. 2004) (act of state defense does not immunize actions that are "commercial—not governmental").

These principles apply with equal if not greater force here: the act of state defense should not be applied to permit Argentina and Chevron to profit from Argentina's sale of shares to U.S. and other investors on the NYSE (or other exchanges) as a commercial actor (*i.e.*, as YPF's sole shareholder) and subsequent seizure of those shares in violation of YPF's corporate bylaws, free from liability based solely on Argentina's status as a sovereign nation.

Chevron spends considerable effort (Br. at 8-9) describing the purported purpose of the Expropriation Act and explaining purported "public interests" that it asserts the Act is intended to serve. Putting aside for now that Chevron's self-serving ruminations of the history, purpose, and effects of the Act fall well outside the four corners of the Complaint, these purported ex-post justifications for Argentina seizure of Repsol's majority interest in YPF do not provide a basis for applying the act of state defense to immunize Argentina's violation of the bylaws, much less for dismissing Repsol's distinct claims against Chevron for tortiously interfering with Argentina's compliance with the bylaws or its actions in aiding and abetting YPF's government-appointed managers' breaches of fiduciary duties. As the Second Circuit explained in *NML Capital, Ltd. v. Republic of Argentina*, where, as here, Argentina has engaged in commercial activity, its purported public policy justifications for its misconduct are "simply irrelevant" and do not give rise to an act of state defense. 680 F.3d 254, 260 (2d Cir. 2012); *see also Republic of Argentina*, 504 U.S. at 617 ("[I]t is irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it matters only that it did so."); *EM Ltd. v. Republic of Argentina*,

2009 WL 3149601, at *7 (S.D.N.Y. Sept. 30, 2009) (Griesa, J.) (where Argentina acted "as a 'private player' in the marketplace," its actions were commercial regardless of purpose).

> **B.     The Complaint Challenges Acts And Omissions That Occurred Beyond Argentina's Borders**

It is well established that an act of state defense may properly be invoked only where the challenged act or omission  "come[s] to complete fruition within a foreign state." *Boland*, 614 F. Supp. at 1173; *Lightwater Corp. v. Republic of Arg.*, 2003 WL 1878420, at *5 (S.D.N.Y. Apr. 14, 2003) (Griesa, J.) (the act of state doctrine "applies only to actions of a nation within its territory").  The Second Circuit has made clear that a foreign state's purportedly sovereign acts are not immune from suit where, as here, they result in extraterritorial effects. *See United Bank Ltd. v. Cosmic Int'l, Inc.*, 542 F.2d 868, 876 (2d Cir. 1976) ("The act of state doctrine was not intended to permit foreign governments to circumvent American public policy.  For this reason, our courts have always been wary of inadvertently extending extraterritorial effect to foreign seizures."); *Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 521-22 (2d Cir. 1985) (holding that act of state defense was inapplicable to a foreign state's seizure of debt instruments owned by U.S. investors where the situs of the debt at issue was the United States).

Here, the Complaint alleges that Argentina, upon seeking to take control of the Company, was required to make a tender offer in New York City for the Company's outstanding shares and to publicize the tender offer in the major New York newspapers, but failed to do so; and that YPF's government-appointed managers lacked authority to enter the agreements with Chevron because Argentina failed to comply with the Company's bylaws.  Argentina's failure to abide the bylaw requirements by its failure to make the tender offer in New York City is an omission that occurred in New York, not in Argentina. *See Lightwater Corp.*, 2003 WL 1878420, at *5 ("An act of a nation in failing to make payments on bonds held in other countries does not constitute an act of state dealing with property located within the nation."); *Republic of Argentina*, 504 U.S. at 619 (the failure to perform an act required to be performed in the U.S "necessarily ha[s] a 'direct effect' in the United States"); *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238,

241 (2d Cir. 1994) (failure to make contractually-obligated payment in the U.S. caused direct effect in the U.S.).[12]

Moreover, a significant portion of the ADS that Argentina seized from Repsol in violation of the bylaws were traded on the NYSE.  "The ADR system is the means by which American investors hold and trade equity interests in foreign companies."  *Seybold v. Groenink*, 2007 WL 737502, at *1 n.1 (S.D.N.Y. Mar. 12, 2007) (citations omitted).  "In order for a foreign corporation to trade on an American stock exchange, the foreign corporation must issue and deposit American Depository Shares ('ADSs') with an American financial institution.  The depository institution then issues American Depository Receipts ('ADRs') to the beneficial owners of the ADSs, who may sell the ADSs on American securities exchanges."  *Id.*  The Bank of New York Mellon is the depository institution for the ADS at issue in this action, and the depository agreement for the ADS provides: "This Deposit Agreement and the Receipts shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York."  (Broome Decl. Ex. A.)

Thus, the tender offer required by YPF's bylaws not only had to be made in New York, but it was for ADS listed and traded on the NYSE, deposited with a New York financial institution, and governed by New York law.  Contrary to Chevron's argument, Argentina's seizure of Repsol's NYSE-traded ADS cannot be said to have occurred solely within Argentina's borders because the act necessarily had an impact outside of Argentina, including in the United States.  *See Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, 2002 WL 432390, at *7 (S.D.N.Y. Mar. 20, 2002) (court properly could adjudicate lawsuit by plaintiffs who invested in a foreign corporation "by purchasing ADRs–which were issued by a New York bank and traded on the New York Stock Exchange"); *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 33 (2d Cir. 2002)

---

[12]  *See also Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 818 (6th Cir. 2002) (same); *Hanil Bank v. P.T. Bank Negara Indonesia (Persero)*, 148 F.3d 127, 132 (2d Cir. 1998) (failure to make required payment on a letter of credit in the United States caused direct effect in the United States); *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 727 (9th Cir. 1997) (failure to perform contract in the United States caused direct effect in the United States).

("A strong public interest favors access to American courts for those who use American securities markets.").

For this reason (among others), Chevron's reliance on *Ethiopian Spice Extraction Share Co. v. Kalamazoo Spice Extraction Co.*, 543 F. Supp. 1224 (W.D. Mich. 1982)—a decision that was reversed by the Sixth Circuit, *see Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*, 729 F.2d 422 (6th Cir. 1984)—is entirely misplaced.  In *Ethiopian Spice*, the plaintiff purchased privately held shares in an Ethiopian company *in Ethiopia*; the only asserted basis for filing the action in the United States was that the plaintiff was a U.S. company and shipped the stock certificates from Ethiopia back to its headquarters in the United States.  *Id.* at 1232-33.  *Ethiopian Spice* stands in stark contrast to the situation here, where Argentina, as a YPF shareholder, took action beyond its borders and came into New York, to initiate an IPO and issue shares in New York and on the NYSE, and registered bylaws with the SEC that required Argentina to make a tender offer in New York for YPF's shares in the event Argentina sought to take control of the Company, in order to attract investors in the U.S. and abroad.  Moreover, in *Ethiopian Spice*, the plaintiff challenged the act of expropriation of the shares as opposed to a breach of a purely commercial agreement (*e.g.*, a breach of bylaws), *id.* at 1226, such as the breach at issue in this action.  Indeed, in *Ethiopian Spice*, the court specifically noted that, unlike here, "there has been no suggestion that the [government] was engaged in purely commercial activity." *Id.* at 1229.

Accordingly, to the extent that Repsol's claims against Chevron relate to Argentina's violations of YPF's bylaws, the claims relate to acts and omissions by Argentina that did not "come to complete fruition within" Argentina, and therefore the act of state defense is inapplicable.  *See Boland*, 614 F. Supp. at 1173; *Lightwater Corp.*, 2003 WL 1878420, at *5.

## CONCLUSION

For the foregoing reasons, Chevron's motion to dismiss should be denied.

Dated: March 8, 2013
    New York, New York

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____
    Richard I. Werder, Jr.
    rickwerder@quinnemanuel.com
    Sascha N. Rand
    sascharand@quinnemanuel.com
    Stephen A. Broome
    stephenbroome@quinnemanuel.com
    Jacob J. Waldman
    jacobwaldman@quinnemanuel.com
    51 Madison Avenue, 22nd Floor
    New York, New York 10010
    (212) 849-7000

*Attorneys for Plaintiff Repsol, S.A.*